UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| TIMOTHY J. NOLAN, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| v. | ) | CIVIL ACTION |
| | ) | NO. 02-12228-JGD |
| ALLEN KRAJCIK, et al., | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM AND ORDER ON
## DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT

July 12, 2005

DEIN, U.S.M.J.

## I.  INTRODUCTION

In this action, plaintiff Timothy J. Nolan ("Nolan"), contends that the defendants violated his constitutional and common law rights in connection with his removal from an Easton, Massachusetts town meeting on June 12, 2000 and the subsequent publicity concerning the incident.  Additionally, Nolan's spouse, plaintiff Marie F. Nolan, is seeking relief for loss of consortium resulting from the defendants' allegedly improper treatment of her husband.  The defendants are three Easton police officers, Allen Krajcik ("Krajcik"), William Fulcher ("Fulcher"), and Stanley Bates ("Bates"), as well as the Town of Easton ("Easton" or "Town") and Kevin Paicos ("Paicos"), who was serving as the Town Administrator for Easton at the time of the incident.  The plaintiffs have named the individual defendants in both their individual and official capacities.

The Complaint contains nine counts consisting of federal civil rights claims and state law claims.  Nolan alleges, pursuant to 42 U.S.C. § 1983, that all of the defendants deprived him of rights secured by the United States Constitution, and that Krajcik, Paicos and Bates are also liable for punitive damages (Counts I through IV).   Nolan also alleges claims against Krajcik and Fulcher for assault and battery (Count V), against Paicos and Bates for defamation (Count VI), against Krajcik, Fulcher, Bates and Paicos for violations of the Massachusetts Civil Rights Act, Mass. Gen. Laws ch. 12, § 11 ("MCRA") (Count VII), and against the Town for negligence under the Massachusetts Tort Claims Act, Mass. Gen. Laws ch. 258 ("MTCA") (Count VIII).  Finally, Mrs. Nolan asserts a claim for loss of consortium against all of the defendants (Count IX).

The matter is presently before the court on each of the defendant's motion for summary judgment.  For all the reasons detailed herein, the motions of Krajcik, Bates, Paicos and the Town for summary judgment (Docket Nos. 25, 27, 29 and 31) are ALLOWED.  The motion of Fulcher for summary judgment (Docket No. 33) is DENIED as to the claims in Counts I, V, VII and IX relating to his alleged use of excessive force outside the gymnasium, and otherwise ALLOWED.

## II. **STATEMENT OF FACTS**[1]

The following facts relevant to the defendants' motions are undisputed unless

otherwise indicated.

---

[1] The facts are derived from the following materials: (1) Statement of Material Facts
Pursuant to District Court Rule 56.1 (Docket No. 26) in support of defendant Krajcik's motion
for summary judgment ("KF") and exhibits thereto ("Krajcik Ex. __"); (2) Plaintiffs' Local Rule
Response to defendant Krajcik's Statement of Material Facts and Plaintiffs' Statement of
Additional Material Facts (Docket No. 46) ("PRK") and exhibits thereto ("PRK Ex.__");
(3) Response to Plaintiffs' Statement of Additional Material Facts contained in Krajcik's reply
brief (Docket No. 57) ("KR"); (4) Statement of Material Facts Pursuant to District Court Rule
56.1 (Docket No. 34) in support of defendant Fulcher's motion for summary judgment ("FF") and
exhibits thereto ("Fulcher Ex. __"); (5) Plaintiffs' Response to Fulcher's Statement of Material
Facts and Statement of Additional Material Facts contained in the Plaintiffs' Memorandum of
Law in Opposition to Defendant Fulcher's Motion for Summary Judgment (Docket No. 49)
("PRF") and exhibits thereto ("PRF Ex. __"); (6) facts set forth in Fulcher's reply brief (Docket
No. 56) ("FR"); (7) Statement of Material Facts Pursuant to District Court Rule 56.1 (Docket
No. 32) in support of defendant Bates' motion for summary judgment ("BF") and exhibits thereto
("Bates Ex. __"); (8) Plaintiffs' Response to Defendant Bates' LR 56.1 Statement of Material
Facts and Statement of Additional Material Facts contained in Plaintiffs' Memorandum of Law in
Opposition to Defendant Bates' Motion for Summary Judgment (Docket No. 52) ("PRB") and
exhibits thereto ("PRB Ex. __"); (9) Bates' Response to Plaintiff's Statement of Additional Facts
and Additional Material Facts contained in Bates' reply brief (Docket No. 55)
("BR"); (10) Statement of Material Facts Pursuant to District Court Rule 56.1 (Docket No. 30) in
support of defendant Paicos' motion for summary judgment ("PF") and exhibits thereto ("Paicos
Ex. __"); (11) Plaintiffs' Response to Defendant Paicos' Statement of Material Facts and
Statement of Additional Material Facts contained in Plaintiffs' Memorandum of Law in
Opposition to Defendant Paicos' Motion for Summary Judgment (Docket No. 51) ("PRP") and
exhibits thereto ("PRP Ex. __"); (12) Response to Plaintiff's Statement of Additional Material
Facts contained in Paicos' reply brief (Docket No. 58) ("PR"); (13) Statement of Material Facts
Pursuant to District Court Rule 56.1 (Docket No. 28) in support of defendant Town of Easton's
motion for summary judgment ("EF") and exhibits thereto ("Easton Ex. __"); (13) Plaintiffs'
Response to Defendant's LR 56.1 Statement of Material Facts and Statement of Additional
Material Facts contained in Plaintiffs' Memorandum of Law in Opposition to Defendant Easton's
Motion for Summary Judgment (Docket No. 50) ("PRE") and exhibits thereto ("PRE Ex. __");
and (14) Easton's response to the plaintiffs' statement of additional facts contained in Easton's
reply brief (Docket No. 59) ("ER").

### The Incident

On June 12, 2000, plaintiff Timothy Nolan attended an Easton, Massachusetts town meeting held at the Oliver Ames High School gymnasium.  (KF ¶ 1; Compl. ¶ 10). The defendants have submitted two videotapes of the events of the meeting on which all parties agree the court may rely in addition to the documentary submissions.

Prior to the date of the meeting, the Town's Chief of Police, defendant Bates, and the Town's Deputy Chief of Police, defendant Krajcik, anticipated that there would be some controversy at the meeting concerning the anticipated termination of defendant Paicos' employment as Easton's Town Administrator.  (PF ¶ 15; PRK ¶ 61).  Thus, Bates assigned Krajcik and another police officer, defendant Fulcher, to provide security at the June 12 meeting.  (BF ¶ 14; PRK ¶ 60; PRK Ex. D at 86).  Bates also attended the meeting.  (BF ¶¶ 15-19).

The purpose of the June 12 town meeting was to resolve budget issues.  (See Krajcik Exs. B & C).  Nevertheless, during the course of the meeting, John Leahy, a town resident, sought to bring before the meeting issues in support of Paicos, and proposed a non-binding resolution praising Paicos.  (KF ¶ 4; PRK ¶ 63).  Leahy's efforts in support of Paicos received vocal support from many members of the crowd.  (PRK ¶ 67; PRK Exs. R & Q).

Nolan believed it was unfair to allow Leahy to raise issues favorable to Paicos out of order during this very lengthy meeting.  (PRK ¶ 69).  Nolan challenged Paicos' right to speak by standing up and reminding the town moderator that there was a pending motion

on the floor.  (KF ¶ 5; PRK ¶ 69).  The moderator responded to the plaintiff stating, "I understand that sir."  (KF ¶ 6).  The plaintiff then asked, "[t]hen why are you turning this into a circus?  Is this your pep rally?"  (Id. at ¶ 7).  He continued to criticize the moderator for allowing the town meeting to become a "circus" and a "pep rally," and concluded his comments to the moderator by saying, "I'm sick of it.  I've heard it.  I get the same crap on TV.  So why don't you get going, get this thing finished."  (Id. at ¶¶ 8-9; PRK ¶ 70). Some members of the audience reacted to these statements by booing Nolan.  (KF ¶ 10; PRK ¶ 70).

At this point, Nolan turned his attention away from the moderator and toward the audience yelling, "[y]eah, boo you."  (KF ¶ 11 and Krajcik Exs. B & C).  Someone from the audience shouted for Nolan to sit down, and one or more persons heckled him and called him an "asshole."  (KF ¶ 12; PRK ¶ 70).  Nolan responded, saying, "[n]o, you come make me sit down," to which the audience replied with boos.  (KF ¶¶ 13, 14). Nolan then waved his arms toward the audience and stated, "[c]ome on down and make me sit down – assholes."  (Id. at ¶ 15).  No one from the audience approached Nolan, and Nolan returned to his seat.  (Id. at ¶ 26; PRK ¶¶ 73, 75).  He did, however, continue to shout at the audience.  (Krajcik Exs. B & C).

Neither the moderator nor the police who attended the meeting made any effort to admonish the audience members who were heckling Nolan.  (PRK ¶ 71, Krajcik Exs. B & C).  However, Krajcik, dressed in plainclothes, rapidly approached Nolan after Nolan had returned to his seat.  (KF ¶ 26; PRK ¶ 76).  According to Krajcik, at the time he

approached Nolan, Krajcik was not concerned that someone might accept Nolan's invitation to make him sit down and that an affray might ensue.  (PRK ¶ 74).  Rather, Krajcik testified that he had determined that Nolan's speech and gestures constituted disorderly conduct and that while he had probable cause to do so, he had no intention of arresting him, but only wanted to calm him down.  (PRK ¶¶ 77, 79, 80).  For his part, Nolan contends that Krajcik tried to silence him because Krajcik was a Paicos supporter who had worked with Paicos during Paicos' tenure as Town Administrator, although Nolan offers no facts to support this contention.  (See PRK ¶¶ 58, 59).

Nolan rose to his feet as Krajcik approached him.  (KF ¶ 26).  Nolan and another witness recalled that Krajcik said something to the effect of "you're out of here" or "you're all done talking."  (PRK ¶ 82).  The plaintiff denies that he understood that Krajcik was a police officer.  Although Krajcik contends he was wearing his officer's badge on his belt with his jacket open, and that he identified himself as a police officer when he approached the plaintiff, Nolan claims that Krajcik did not identify himself and that he did not notice a badge or anything else distinguishing Krajcik as a police officer.[2] (KF ¶¶ 23, 24; PRK ¶ 51-54; KR ¶ 52).  Fulcher claims that he heard Krajcik identify himself to Nolan.  (FF ¶ 34).

When Krajcik reached Nolan, he placed his hand on the plaintiff's left arm and began speaking to him.  (KF ¶ 27).  Nolan then "turned away from Krajcik and began to

---

[2]  Nolan admitted that at some point during the incident he heard someone say, in substance, the words "he is the Deputy Chief."  (FR at 1).

sit down." (Id. at ¶ 28). Krajcik continued to speak to Nolan, while putting his arm around Nolan's back. (Id. at ¶ 29). Nolan reacted to Krajcik's action by pushing him away and then pushing him backwards. (Id. at ¶¶ 30, 32; Krajcik Ex. C). Although it was later reported in the newspaper that Krajcik described Nolan's act of pushing him away as "a non-combative 'keep away' gesture," videotapes of the incident show that the parties were yelling at each other, that Nolan pushed Krajcik away forcefully, and that the events happened quite quickly. (See PRK ¶ 87; PRK Ex. M; Krajcik Ex. C). Fulcher, having observed Krajcik approach Nolan and Nolan pushing Krajcik backwards, went over to assist Krajcik in restraining the plaintiff. (FF ¶¶ 33, 35, 37; KF ¶ 33). Other Easton police officers, several in uniform, also arrived to assist in the matter. (KF ¶ 33). The police officers then removed Nolan from the town meeting by pushing and pulling him through the aisles of the gymnasium where the meeting was occurring. (Id. at ¶ 34; PRK ¶ 34). While removing Nolan from the gymnasium, Krajcik physically restrained Nolan's hands and repeatedly told him "to 'relax' and 'take it easy.'" (KF ¶¶ 37-38). Videotapes of the incident show that Fulcher (in plainclothes) had his arm around the plaintiff's neck as he moved Nolan through the gymnasium. (Krajcik Ex. B & C). Bates, who had observed the events, followed behind the other officers as they took Nolan from the town meeting. (BF ¶¶ 15-19).

It is undisputed that Nolan struggled and resisted throughout the course of his removal from the gymnasium. (KF ¶¶ 35, 36; FF ¶¶ 27, 28). Nolan contends that he was defending himself and was unaware that the defendants were police officers. (PRK ¶¶

35, 36; PRF ¶¶ 27, 28).  He makes no mention of the uniformed police who were escorting him out.

The dispute continued outside the gymnasium, although there is no videotape of these events.  According to the (disputed) record, Fulcher had Nolan in a choke hold and Nolan was having difficulty breathing.  (PRF ¶ 54; PRF Ex. H at 49).  Fulcher allegedly also twisted Nolan's arm and pushed him toward a wall.  (FF ¶¶ 48, 49, 51; PRF ¶ 54).  Two of Nolan's friends who were present during these events intervened on Nolan's behalf because they were concerned about Nolan's physical well-being and believed that Fulcher was trying to hurt Nolan.  (PRF ¶¶ 55, 56).  Following the incident, Nolan was diagnosed with a torn rotator cuff and experienced problems with his throat, including soreness and difficulty swallowing.  (PRF ¶ 57).  The plaintiff has not submitted any evidence as to where Krajcik and Bates were located during the events outside or as to how much time elapsed before things broke up.

Krajcik prepared an incident report on the night of June 12, 2000.  (KF ¶ 39).  In his report, Krajcik described Nolan's behavior as that of a disorderly person pursuant to Mass. Gen. Laws ch. 272, § 53.  (Id.).  Specifically, Krajcik's report reads, among other things, that Nolan

> became a disorderly person (MGL 272/53) when he began
> challenging people to fight with him and yelled obscenities toward
> the audience.  At one point he yelled "assholes" in the general
> direction of the back of the gym and said "come on!, come on!"
> challenging those people to fight him.  Several people had yelled at
> him to be quiet and sit down.

(Krajcik Ex. E at 1-2).  No other potential charges against Nolan are identified in the

report.  (PRK ¶ 78).  Krajcik concluded his report by stating that he explained to Nolan

that he was using his discretion not to arrest Nolan as long as Nolan remained calm.

(Krajcik Ex. E at 2; <u>see</u> <u>also</u> PRK ¶ 86).

The Easton Police Department has promulgated policies setting forth guidelines

and procedures for arrests.  (EF ¶ 17; Easton Ex. D).  The policies state, in relevant part,

that "[v]erbal abuse alone is not a sufficient justification for an arrest."[3]  (EF ¶ 18).  In

addition, the policies recognize and address a police officer's discretion not to make an

arrest where the arrest is justified, but alternatives are available.  (KF ¶¶ 41, 44; Krajcik

Ex. F at § IX).  A verbal warning is one such alternative to an arrest.  (KF ¶ 45).

Krajcik was aware of the Easton Police Department's policies relating to arrests.

(<u>Id.</u> at 42).  In fact, in June 2000, Krajcik was the accreditation manager for the police

department, and was responsible for developing the department's policies and procedures

in order to meet national standards.  (<u>Id.</u> at ¶¶ 17-18).  Moreover, Krajcik received

---

[3]  In their Statement of Additional Material Facts contained in the "Plaintiffs' Memoran-
dum of Law in Opposition to Defendant Easton's Motion for Summary Judgment" (Docket No.
50), the plaintiffs assert that Easton maintains policies or customs (1) prohibiting residents from
criticizing public officials when addressing the assembly at town meetings, (2) prohibiting
residents from speaking to the assembly if they do not do so respectfully, (3) allowing the police
to remove residents from town meetings for breaching the peace by yelling loudly, and (4) allow-
ing the town moderator to delegate authority and responsibility to police officers to remove
residents from town meetings where the police officers independently deem, "in their blanket
discretion," that those residents have engaged in "'disorderly' speech or other expressive
activity."  (PRE ¶¶27-30).  The Town of Easton has disputed these assertions and has argued that
they are not supported by the plaintiffs' citations to the record.  (<u>See</u> ER at 1).  This court finds
that neither the testimony cited by the plaintiffs nor the other evidence that the parties have
presented to the court establishes that the Town had any such policies or customs.

training material specifically addressing arrests for a breach of the peace and disorderly

conduct.  (Id. at ¶ 46; Krajcik Ex. H).  The training material describes a breach of the

peace as "a violation of public order and tranquility or any act or disturbance which

disrupts the public peace."  (EF ¶ 23).  It also provides:

> "A person is guilty of disorderly conduct if, with purpose to cause
> public inconvenience, annoyance or alarm, or recklessly creating a
> risk thereof, he: (a) engages in fighting or threatening, or (b) in
> violent or tumultuous behavior; or (c) creates a hazardous or
> physically offensive condition by any act which serves *no legitimate
> purpose* of the actor."[4]

(EF ¶ 24; Krajcik Ex. H) (emphasis in original).

Krajcik was also aware of the Police Department's policy regarding neglect of

duty, which specifically requires officers "to be attentive to and not neglect their sworn

duty."  (KF ¶ 48; Krajcik Ex. I ¶ 18(A)).  Pursuant to the policy, a neglect of duty

includes, but is not limited to, "failure to take appropriate action on the occasion of a

crime, public disorder or other act or condition deserving attention . . . ."  (KF ¶ 47;

Krajcik Ex. I ¶ 18(F)).

## The Aftermath

Following the town meeting, the Brockton Enterprise published a newspaper

article in which Bates was quoted as saying "this wasn't the first time Mr. Nolan had to

be escorted out of a town meeting."  (BF ¶¶ 21-22; Bates Ex. E).  Bates' statement refers

---

[4]  The training material that Krajcik received contains a citation to a Massachusetts court
case that aids in defining disorderly conduct within the context of a political demonstration.  (EF ¶
25).

to an incident that occurred at a town meeting in 1991, and was made in response to a question as to whether the June 12, 2000 incident was the first time that someone had to be physically ejected from an Easton town meeting. (Bates Ex. E; BF ¶ 24; PRB ¶ 24 at Ex. S). In 1991, the town moderator had ruled that Nolan was speaking out of order, and a constable in uniform had escorted Nolan from the meeting. (BF ¶¶ 24-25; PRB ¶ 24 at Ex. S). He was subsequently asked to return to the meeting. (PRB ¶ 28).

The Brockton Enterprise also published a report in its police blotter section, which read in its entirety that "[a]t 10:45 p.m., a disorderly resident was removed from town meeting by Deputy Police Chief Krajcik and detectives." (BF ¶¶ 26-27). While Nolan alleges that both Bates and Paicos were responsible for the report's publication in the press (BF ¶¶ 20, 21, 26; PRB ¶¶ 16, 20), he has not presented evidence to support that contention.

On June 19, 2000, the Easton Board of Selectmen held a meeting at which an Easton resident suggested that there should be an investigation regarding the circum-stances of Nolan's removal from the June 12 town meeting by the police officers. (PRK ¶ 88). Paicos, who was present at the Selectmen's meeting, responded by saying that all officers involved acted with "remarkable restraint and discretion. I've sent the police a letter of commendation. They acted very professionally." (Id.). Paicos' statement was published in the newspaper, which also quoted Paicos as saying, "[a]ny representation that any Easton police officer acted wrongly here is nothing more than an outrageous rumor" and "[n]o complaints or charges have been raised by anyone in town, and the

town didn't charge the resident in question with anything."  (PF ¶¶ 17-19; Paicos Ex. D).

In fact, on June 13 and 14, 2000, a town resident had written to Bates, with a copy to

Paicos, expressing concerns regarding Krajcik's treatment of Nolan and asking that

"appropriate steps" be taken.  (PF ¶¶ 22-23; Paicos Ex. F).

The only other Easton town meeting that Nolan has attended since June 12, 2000

took place in the early fall of 2000.  (PRK ¶ 89).  At the meeting, Nolan sat on the

bleachers with his wife.  (Id.).  Krajcik, who was also present, circled around Nolan and

then sat on the bleachers behind him.  (Id.).  Nolan testified that after he noticed Krajcik

behind him, Nolan left the meeting feeling uncomfortable and intimidated.  (Id.).

Additional factual details relevant to the court's analysis are described below.

### III.  ANALYSIS

#### A.    Summary Judgment Standard of Review

Summary judgment is appropriate when "the pleadings, depositions, answers to

interrogatories, and admissions on file, together with the affidavits, if any, show that there

is no genuine issue as to any material fact and that the moving party is entitled to a

judgment as a matter of law."  Fed. R. Civ. P. 56(c).  A genuine issue is "one that must be

decided at trial because the evidence, viewed in the light most flattering to the nonmovant

. . . would permit a rational fact finder to resolve the issue in favor of either party."

Medina-Munoz v. R.J. Reynolds Tobacco Co., 896 F.2d 5, 8 (1st Cir. 1990) (internal

citations omitted).  A material fact is one which has the "potential to affect the outcome

of the suit under the applicable law."  Sanchez v. Alvarado, 101 F.3d 223, 227 (1st Cir.

1996) (internal citations and quotation omitted).

The moving party bears the initial burden of establishing that there is no genuine

issue of material fact.  See Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S. Ct. 2548,

2553, 91 L. Ed. 2d 265 (1986).  If that burden is met, the opposing party can avoid

summary judgment only by providing properly supported evidence of disputed material

facts that would require trial.  See id. at 324, 106 S. Ct. at 2553.  In evaluating motions

for summary judgment, however, the court will not consider "conclusory allegations,

improbable inferences, and unsupported speculation."  Galloza v. Foy, 389 F.3d 26, 28

(1st Cir. 2004) (internal citation omitted).

### B.    Claims Under 42 U.S.C. § 1983 - In General

Nolan has asserted various claims against the defendants seeking recovery under

42 U.S.C. § 1983 for alleged violations of his constitutional rights.  Section 1983 "is not

itself a source of substantive rights, but merely provides a method for vindicating federal

rights elsewhere conferred."  Graham v. Connor, 490 U.S. 386, 393-94, 109 S. Ct. 1865,

1870, 104 L. Ed. 2d 443 (1989) (quotations and citation omitted).  It states:

> Every person who, under color of any statute, ordinance, regulation,
> custom, or usage, of any State or Territory or the District of
> Columbia, subjects, or causes to be subjected, any citizen of the
> United States or other person within the jurisdiction thereof to the
> deprivation of any rights, privileges, or immunities secured by the
> Constitution and laws, shall be liable to the party injured in an action
> at law, suit in equity, or other proper proceeding for redress ....

42 U.S.C. § 1983.  "A claim under section 1983 has two essential elements.  First, the challenged conduct must be attributable to a person acting under color of state law [and] second, the conduct must have worked a denial of rights secured by the Constitution or by federal law."  Soto v. Flores, 103 F.3d 1056, 1061(1ˢᵗ Cir. 1997), cert. denied, 522 U.S. 819, 118 S. Ct. 71, 139 L. Ed. 2d 32 (1997).  In the instant case, there is no dispute that each of the individual defendants was acting in his official capacity at all relevant times and was therefore acting under color of state law.  However, the defendants dispute that any of their conduct deprived Nolan of his constitutional rights.  Moreover, Krajcik and Fulcher argue that even if they violated Nolan's constitutional rights, they are shielded from liability by the doctrine of qualified immunity.

As detailed herein, this court finds that Nolan has failed to state a claim that the Town, Paicos or Bates violated his constitutional rights.  With respect to Krajcik, Nolan has stated a claim that the defendant violated his rights to free speech and his right not to be seized without probable cause, although he has not stated a claim that Krajcik used excessive force.  Nevertheless, the § 1983 claims against Krajcik are barred by the doctrine of qualified immunity.  With respect to Fulcher, Nolan has stated a claim that the defendant violated his right to free speech, and his right not to be seized without probable cause, but these claims are also barred by the doctrine of qualified immunity.  Nolan has also stated a claim that Fulcher used excessive force, but only with respect to events which took place outside the gymnasium.  Fulcher is not protected by qualified immunity

from this claim of use of excessive force, and it survives Fulcher's motion for summary judgment.

### C.   Count I  vs.  Krajcik, Fulcher and Bates
####      42 U.S.C. § 1983

In Count I of his Complaint, Nolan alleges that the defendant police officers deprived him of various rights under the United States Constitution, including his right to free speech and participation in the political process, his right to be secure in his person, and his right to remain free from the use of excessive force in the seizure or custody of his person.[5]  Specifically, Nolan contends that he was exercising his First Amendment right to free speech at the time he was removed from the town meeting.  Moreover, Nolan claims that because he was engaged in constitutionally protected speech, the police officers had no probable cause to arrest him for disorderly conduct, and therefore violated the Fourth Amendment's proscription against unreasonable seizures.  In addition, Nolan contends that the police used excessive force in effectuating his removal, in violation of his Fourth Amendment rights.

For their part, the police defendants claim that Nolan's speech constituted "fighting words" as a matter of law, and, therefore, was not constitutionally protected. Thus, they contend, there was probable cause to arrest Nolan for disorderly conduct under Mass. Gen. Laws ch. 272, § 53.  They further contend that the undisputed facts

---

[5]  While the Complaint refers to Nolan's rights under the First, Fourth, Fifth, Sixth and Fourteenth Amendments to the Constitution, Nolan has not developed these claims except as described herein.

-15-

establish that no excessive force was used as a matter of law.  Each of these matters will be discussed below.

As an initial matter, however, this court recognizes that Nolan has argued that he was entitled to legislative immunity as a town meeting participant, as a result of which he could not be arrested at the meeting as a matter of law.  See, e.g., Plaintiffs' Mem. in Opp. to Defendant Krajcik's Motion for Summary Judgment (Docket No. 45) at 3-6. However, he cites no support for the proposition that a non-elected, non-appointed town resident qualifies as a "municipal legislator" or that all speakers at an open town meeting are entitled to "immunity" beyond general constitutional safeguards.  This court declines the plaintiffs' suggestion that this novel theory be certified to the Massachusetts Supreme Judicial Court.  See id. at 5-6 n.2.

## 1.      Free Speech  vs.  Fighting Words

Mass. Gen. Laws ch. 272, § 53 makes it a criminal offense to be an "idle and disorderly" person.[6]  Although "[j]udicial construction of the term 'idle and disorderly' has had a tortured history in the case law" of Massachusetts, the Supreme Judicial Court has made it clear that "the statute only can reach conduct 'which involves no lawful

---

[6]  Mass. Gen. Laws ch. 272, § 53 states in its entirety: "Common night walkers, common street walkers, both male and female, common railers and brawlers, persons who with offensive and disorderly acts or language accost or annoy persons of the opposite sex, lewd, wanton and lascivious persons in speech or behavior, idle and disorderly persons, disturbers of the peace, keepers of noisy and disorderly houses, and persons guilty of indecent exposure may be punished by imprisonment in a jail or house of correction for not more than six months, or by a fine of not more than two hundred dollars, or by both such fine and imprisonment."

exercise of a First Amendment right.'" Commonwealth v. Feigenbaum, 404 Mass. 471, 473-74, 536 N.E.2d 325, 327 (1989) (quoting Commonwealth v. A Juvenile, 368 Mass. 580, 599, 334 N.E.2d 617, 629 (1975)).  Therefore, if the plaintiff's speech was entitled to First Amendment protection, the defendants had no grounds to arrest him for disorderly conduct.  This court finds, however, that the question as to whether Nolan's communications constituted constitutionally protected free speech or unprotected "fighting words" cannot be resolved on summary judgment.

Freedom of speech, "which [is] protected by the First Amendment from infringe-ment by Congress, [is] among the fundamental personal rights and liberties which are protected by the Fourteenth Amendment from invasion by state action." Chaplinsky v. New Hampshire, 315 U.S. 568, 570-71, 62 S. Ct. 766, 768, 86 L. Ed. 1031 (1942) (quotations and citations omitted).  However, "it is well understood that the right of free speech is not absolute at all times and under all circumstances.  There are certain well-defined and narrowly limited classes of speech, the prevention and punishment of which has never been thought to raise any Constitutional problem."  Id. at 571-72, 62 S. Ct. at 769.  One of these unprotected classes of speech is known as "'fighting' words – those which by their very utterance inflict injury or tend to incite an immediate breach of the peace."  Id. at 572, 62 S. Ct. at 769.  See also Gooding v. Wilson, 405 U.S. 518, 523, 92 S. Ct. 1103, 1106, 31 L. Ed. 2d 408 (1972) ("Our decisions since Chaplinsky have continued to recognize state power constitutionally to punish 'fighting' words . . . .").

"[T]he line between speech unconditionally guaranteed and speech which may legitimately be regulated, suppressed or punished is finely drawn, " Gooding, 405 U.S. at 522, 92 S. Ct. at 1106 (quotations and citation omitted), and "[t]he unprotected category of speech called 'fighting words' is an extremely narrow one." Johnson v. Campbell, 332 F.3d 199, 212 (3d Cir. 2003).  Thus, the use of epithets or otherwise profane language alone is not a basis for regulating speech as fighting words.  Id. (citing Cohen v. California, 403 U.S. 15, 20, 91 S. Ct. 1780, 1785-86, 29 L. Ed. 2d 284 (1971)).  Rather, the words must be considered in light of the circumstances in which they are uttered in order to determine whether a reasonable onlooker would have regarded the expression as "a direct personal insult or an invitation to exchange fisticuffs." Texas v. Johnson, 491 U.S. 397, 409, 109 S. Ct. 2533, 2542, 105 L. Ed. 2d 342 (1989).  Only "those personally abusive epithets which, when addressed to the ordinary citizen, are, as a matter of common knowledge, inherently likely to provoke violent reaction," may be banned as fighting words.  Cohen, 403 U.S. at 20, 91 S. Ct. at 1785.  See also DiGiambattista v. Doherty, 897 F. Supp. 649, 659 (D. Mass. 1995).

In this case, the facts raise a genuine issue as to whether Nolan's speech at the town meeting was constitutionally protected.  There is no dispute that Nolan gestured toward the audience, challenged members of the audience to "come on down and make me sit down," and called them "assholes."  These facts, taken together, could support a finding that Nolan's communications were "likely to provoke the average person to retaliation, and thereby cause a breach of the peace." Chaplinsky, 315 U.S. at 574, 62

-18-

S. Ct. at 770.  However, the record also contains evidence suggesting that a reasonable onlooker attending the town meeting may not have considered Nolan's speech likely to arouse a violent reaction.  For example, Nolan's words were not directed at a particular individual and were not especially insulting.  Moreover, the fact that no one from the audience actually approached Nolan in response to his outburst and that Nolan was able to return to his seat without incident suggests that Nolan's language and gesturing, under the circumstances, may not have been particularly provocative.  Indeed, Krajcik, after observing Nolan's exchange with the audience, had no concerns that someone might accept Nolan's invitation to make him sit down or that a fight would erupt.  These facts, viewed in the light most favorable to Nolan, are sufficient to permit a rational factfinder to determine that Nolan's words and gestures were constitutionally protected, and not fighting words.  Therefore, Krajcik, Fulcher and Bates are not entitled to summary judgment on the grounds that Nolan's speech did not merit First Amendment protection.[7]

---

[7] Nolan also argues that Krajcik violated his First Amendment rights by retaliating against him for exercising his First Amendment rights to oppose the efforts to support Paicos.  To support such a § 1983 claim of retaliation,"a plaintiff must first show 'that his conduct was constitutionally protected, and that this conduct was a 'substantial factor' or ... a 'motivating factor'' for the defendant's retaliatory decision."  Powell v. Alexander, 391 F.3d 1, 17 (1st Cir. 2004) (quoting Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle, 429 U.S. 274, 287, 97 S. Ct. 568, 576, 50 L. Ed. 2d 471 (1977)).  Here, however, Nolan relies only on supposition and has not alleged any facts to support the contention that Krajcik's decision to remove Nolan from the town meeting was motivated at all by a desire to punish Nolan for opposing efforts to support Paicos rather than by Nolan's disruptiveness.  Nolan has alleged only that Krajcik had been promoted during Paicos's tenure as Town Administrator, and that the two men otherwise knew each other and were friendly.  This is insufficient to establish retaliatory conduct.

## 2.   **Probable Cause**

Even assuming that Nolan's assertions amounted to unprotected "fighting words," the record is still unclear as to whether Nolan's conduct rose to the level of disorderly conduct under Mass. Gen. Laws ch. 272, § 53.  This court cannot find, as a matter of law, that the police defendants had probable cause to seize Nolan.  Consequently, the defendants' are not entitled to summary judgment on this grounds either.

"The Fourth Amendment guaranty against unreasonable seizures of the person requires that arrests be based on probable cause."  Alexis v. McDonald's Rest. of Massachusetts, Inc., 67 F.3d 341, 349 (1st Cir. 1995).  This probable cause requirement "governs all seizures of the person, including seizures that involve only a brief detention short of traditional arrest."  United States v. Mendenhall, 446 U.S. 544, 551, 100 S. Ct. 1870, 1875, 64 L. Ed. 2d 497 (1980) (quotations and citations omitted).  "Probable cause will be found if 'the facts and circumstances within [the officer's] knowledge and of which [he] had reasonably trustworthy information were sufficient [in themselves] to warrant a prudent [person] in believing that the [defendant] had committed or was committing an offense.'" McDonald's, 67 F.3d at 349 (quoting Rivera v. Murphy, 979 F.2d 259, 263 (1st Cir. 1992)) (punctuation in original). "In sum, the existence of probable cause (and, in turn, the validity of an ensuing arrest) is gauged by an objective standard; as long as the circumstances surrounding the event warrant the officer's reasonable belief that the action taken is appropriate, the arrest is justified."  Logue v. Dore, 103 F.3d 1040, 1044 (1st Cir. 1997) (punctuation in original).  Applying these principles to the

instant case, a dispute remains as to whether the defendants had probable cause to remove Nolan from the town meeting because of his disorderly conduct.

It is now established in Massachusetts "that the 'idle and disorderly persons' provision of G.L. c. 272, § 53, cannot constitutionally be the basis for criminal convictions for the use of offensive and abusive language." Commonwealth v. A Juvenile, 368 Mass. 580, 581, 334 N.E.2d 617, 619 (1975). As a result, "[t]o be disorderly, within the sense of the statute, the conduct must disturb through acts other than speech; neither a provocative nor a foul mouth transgresses the statute." Commonwealth v. LePore, 40 Mass. App. Ct. 543, 546, 666 N.E.2d 152, 155; review denied, 423 Mass. 1104, 668 N.E.2d 356 (1996); Abraham v. Nagle, 116 F.3d 11, 13-14 (1st Cir. 1997).

In defining the conduct which violates Mass. Gen. Laws ch. 272, § 53, the SJC has adopted parts of the Am. Law. Inst., Model Penal Code, § 250.2 (Proposed Official Draft, 1962). See A Juvenile, 368 Mass. at 596-97, 334 N.E.2d at 627-28.[8] Thus, a person who "engages in fighting or threatening, or in violent or tumultuous behavior; or . . . creates a hazardous or physically offensive condition by any act which serves no legitimate purpose of the actor" may be liable for disorderly conduct under Massachusetts law. Id. (internal quotation omitted). As the SJC has explained:

> the type of conduct which the disorderly person provision of § 53 reaches is that conduct which by its very nature involves the use of

---

[8] That part of the Model Penal Code § 250.2 which provided that speech alone could constitute disorderly conduct was found to be unconstitutionally overbroad. See A Juvenile, 368 Mass. at 591-92, 334 N.E.2d at 625.

> physical force or violence or any threat to use such force or violence
> if that threat is objectively possible of immediate execution....  Also
> covered is "tumultuous behavior," which while perhaps not
> physically violent, may nevertheless be characterized as involving
> riotous commotion and excessively unreasonable noise so as to
> constitute a public nuisance.  Conduct which creates a condition of
> physical menace to others is also reached....

Id. at 596-97, 334 N.E.2d at 628.

Consequently, even assuming Nolan's speech constituted "fighting words" for purposes of the First Amendment analysis, in order to show that there was probable cause to arrest him for disorderly conduct, the defendants must establish that an objectively reasonable police officer observing Nolan's words and gestures would have believed that, under the circumstances, Nolan's conduct was physically threatening or sufficiently riotous or noisy to constitute a public nuisance.  In the instant case, that is a determination which must be made by a jury.  See Abraham v. Nagle, 116 F.3d at 14-15 (up to jury to determine whether defendant was "acting to express protected speech or whether he also sought to interfere with [an] arrest" and, thus, whether defendant had probable cause to arrest defendant for disorderly conduct under Mass. Gen. Laws ch. 272, § 53).

Nolan has presented facts which, when viewed in the light most favorable to him, raise a genuine issue as to whether or not the defendants acted with probable cause. Nolan's outburst occurred in the course of a town meeting, a forum in which debate and dissension is allowed and encouraged.  In addition, Nolan's use of profanities and his gesturing were limited, he yelled at the crowd only after being heckled and told to sit

down by members of the audience, and he returned to his seat immediately following his

relatively brief outburst.  Compare Commonwealth v. Sholley, 432 Mass. 721, 729, 739

N.E.2d 236, 242-43 (2000) (defendant's conduct deemed tumultuous where his

screaming and running through the courthouse corridor "went far beyond the level of

noise and commotion ordinarily encountered in court house hallways."), cert. denied, 532

U.S. 980, 121 S. Ct. 1621, 149 L. Ed. 2d 484 (2001).  Since a jury could find that

Nolan's conduct did not rise to the level of disorderly conduct under the statute, the

defendant police officers' contention that probable cause for the seizure existed as a

matter of law must fail.  See Woodley v. Town of Nantucket, 645 F. Supp. 1365, 1370

(D. Mass. 1986) ("the probable cause determination – i.e., whether the facts and

circumstances warranted a person of reasonable caution and prudence in believing that

[the plaintiff] had committed a crime – is left more appropriately to the trier of fact"), and

cases cited.

## Fulcher

Fulcher argues that he is also entitled to summary judgment because he did not

approach Nolan until Nolan was in a pushing match with Krajcik, at which point Fulcher

had probable cause to arrest Nolan for resisting arrest pursuant to Mass. Gen. Laws

ch. 268, § 32B.  Because Nolan has produced sufficient evidence for a reasonable juror to

find that Fulcher did not have probable cause to arrest Nolan for resisting arrest,

Fulcher's motion for summary judgment on this claim must fail.[9]

Mass. Gen. Laws ch. 268, § 32B states in pertinent part:

> (a) A person commits the crime of resisting arrest if he knowingly
> prevents or attempts to prevent a police officer, acting under color of
> his official authority, from effecting an arrest of the actor or another,
> by: (1) using or threatening to use physical force or violence against
> the police officer or another; or (2) using any other means which
> creates a substantial risk of causing bodily injury to such police
> officer or another.

It is unclear whether, at the time Fulcher approached, a reasonable person would

have understood that Krajcik was attempting to effectuate an arrest. "An arrest occurs

where there is (1) 'an actual or constructive seizure or detention of the person, [2]

performed with the intention to effect an arrest and [3] so understood by the person

detained.'" Commonwealth v. Grandison, 433 Mass. 135, 145, 741 N.E.2d 25, 35 (2001)

(quoting Commonwealth v. Cook, 419 Mass. 192, 198, 644 N.E.2d 203, 207-08 (1994)).

There is evidence from which a jury could find that although Krajcik had put his arm

around Nolan's back, Krajcik had made no attempt to "seize" Nolan until Fulcher got

involved. Under such circumstances, the question whether Fulcher had probable cause to

arrest Nolan for resisting arrest would have to be determined by a jury.

---

[9]  Fulcher also claims that he is entitled to summary judgment because he cannot be liable
under § 1983 for simply assisting Krajcik. However, as Nolan points out, his claim against
Fulcher is not based on Fulcher's actions in assisting Krajcik, but on Fulcher's direct involvement
in removing the plaintiff from the town meeting.

**Bates**

Nolan has not alleged any direct actions on the part of Bates in silencing him at the meeting or in seizing him without probable cause.  Rather, he contends that Bates is liable for failure to intervene and prevent the use by Krajcik and Fulcher of excessive force.  Plaintiffs' Mem. of Law in Opp. to Defendant Bates' Motion for Summary Judgment (Docket No. 52) at 3-4.  That contention will be discussed, infra.  Meanwhile, Bates is entitled to summary judgment to the extent that Nolan's § 1983 claim against him is premised on his alleged violation of Nolan's First Amendment rights and his Fourth Amendment right to be free of an arrest without probable cause.

### 3. Excessive Force

Nolan also alleges in Count I of the Complaint that the defendant police officers removed him from the town meeting using excessive force in violation of the Fourth Amendment.  Krajcik and Fulcher argue that the force they used when removing the plaintiff from the town meeting was objectively reasonable and not unconstitutionally excessive.  Bates argues that he should have no liability with respect to Nolan's excessive force claim because his only involvement in Nolan's removal consisted of accompanying the other officers as they removed the plaintiff from the meeting.  This court finds that the plaintiff has presented genuine issues of material fact as to whether Fulcher used excessive force outside the gymnasium during the defendants' seizure of Nolan.  However, his claims of excessive force against Krajcik and Bates fail as a matter of law.

"A claim that the police used excessive force in making an arrest [or seizure] must be analyzed in light of the Fourth Amendment's prohibition of unreasonable searches and seizures."[10] Gaudreault v. Municipality of Salem, 923 F.2d 203, 205 (1st Cir. 1990), cert. denied, 500 U.S. 956, 111 S. Ct. 2266, 114 L. Ed. 2d 718 (1991).  Accord Graham v. Connor, 490 U.S. 386, 395, 109 S. Ct. 1865, 1871, 104 L. Ed. 2d 443 (1989) ("*all* claims that law enforcement officers have used excessive force – deadly or not – in the course of an arrest, investigatory stop, or other 'seizure' of a free citizen should be analyzed under the Fourth Amendment and its 'reasonableness' standard, rather than under a 'substantive due process' approach").  Because "Fourth Amendment jurisprudence has long recognized that the right to make an arrest [or seizure] necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it," a determination as to "whether the force used to effect a particular seizure is 'reasonable' under the Fourth Amendment requires a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake."  Graham, 490 U.S. at 396, 109 S. Ct. at 1871-72 (internal quotations and citations omitted).  Thus, the relevant inquiry in evaluating an excessive force claim "is whether the force used was 'objectively reasonable' under all the circumstances; that

---

[10]  "A 'seizure' triggering the Fourth Amendment's protections occurs only when government actors have, 'by means of physical force or show of authority, . . . in some way restrained the liberty of a citizen.'" Graham, 490 U.S. at 395 n.10, 109 S. Ct. at 1871 n.10 (quoting Terry v. Ohio, 392 U.S. 1, 19, n.16, 88 S. Ct. 1868, 1879 n.16, 20 L. Ed. 2d 889 (1968)).  Nolan clearly was "seized" when the defendant police officers forcibly removed him from the town meeting.

is, whether it was consistent with the amount of force that a reasonable police officer would think necessary to bring the arrestee into custody." Gaudreault, 923 F.2d at 205. See also Alexis v. McDonald's Rest. of Massachusetts, Inc., 67 F.3d 341, 352 (1st Cir. 1995).

It is important to remain mindful, however, that "not every push or shove" rises to the level of a constitutional violation. Moreover, "[t]he 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." Graham, 490 U.S. at 396, 109 S. Ct. at 1872.

The evidence does not support a claim that Krajcik or Bates used excessive force. There is no evidence that Bates had any physical contact with Nolan during the course of the incident. Moreover, the undisputed facts show that the only force that Krajcik used consisted of holding Nolan's hands while removing him from the gymnasium. They further show that Krajcik restrained Nolan only after the plaintiff had forcefully pushed Krajcik.[11]  Given Nolan's conduct toward Krajcik, Krajcik used only a level of force that was reasonably necessary to control the plaintiff and remove him from the gymnasium. There is no evidence that Krajcik touched Nolan at all outside the gymnasium.

---

[11]  The record does not support Nolan's contention that Krajcik used unlawful force when he put his arm around Nolan's back.  Videotapes of the incident indicate that Krajcik used little if any force at all when he put his arm around Nolan's back.  (See Krajcik Exs. B & C).

Nolan argues that Krajcik's (alleged) failure to identify himself as a police officer precluded his use of any force at all.  However, the undisputed facts establish that Krajcik had his badge on his belt and at least intended to identify himself as a police officer.  The record does not support any claim that Krajcik should have known that Nolan did not know he was a police officer.  There also is no evidence that Krajcik intended to fool Nolan into thinking he was not an officer.  Consequently, Nolan's claim of excessive force is appropriately analyzed under the traditional Fourth Amendment analysis of what a reasonable police officer would do.

The record also does not support a claim that Fulcher used excessive force inside the gymnasium.  Fulcher restrained Nolan only after he witnessed the plaintiff push Krajcik away and continue to push Krajcik back.  Having viewed the tape, it is clear that Fulcher's use of force was consistent with what a reasonable officer would have used in order to assist Krajcik and to protect him from harm or the threat of harm by the plaintiff. Nolan kept struggling and, in fact, became more aggressive even though surrounded by police who were clearly in uniform.[12]

Once outside the gymnasium, however, it is unclear whether Fulcher used an objectively reasonable amount of force or whether he employed force that was excessive under the circumstances.  The plaintiffs have presented evidence that Fulcher had Nolan

---

[12]  While there are disputed facts as to whether Nolan knew that Krajcik and Fulcher were police officers (and, therefore, whether Nolan could be liable under Mass. Gen. Laws ch. 268, § 32B), the tapes make it clear that Nolan continued to struggle despite being told repeatedly to "relax" and despite the presence of uniformed officers.

in a choke hold, that Nolan was having difficulty breathing, and that Fulcher twisted

Nolan's arm and pushed him toward a wall.  Furthermore, Nolan has presented testimony

from two of his friends who witnessed Fulcher's conduct toward the plaintiff.  They

testified that they believed Fulcher was trying to hurt Nolan, and that they intervened on

Nolan's behalf because they feared for his well-being.  Nolan also has presented evidence

that he sustained injuries consisting of problems with his throat and a torn rotator cuff as

a result of Fulcher's use of force.  Although the injuries are not especially severe, they

occurred in connection with Nolan's removal for the misdemeanor crime of disorderly

conduct and not in connection with a crime against a person or property.  This court

concludes that the facts, when viewed in the light most favorable to Nolan, could support

a finding that Fulcher used a level of force that exceeded the amount of force that a

reasonable police officer would think necessary to restrain the plaintiff under the circumstances.

Nolan contends that Bates and Krajcik should be liable for failing to intervene in order to protect Nolan from any excessive force used by Fulcher.  "An officer who is present at the scene and who fails to take reasonable steps to protect the victim of another officer's use of excessive force can be held liable under section 1983 for his nonfeasance" as long as the officer had a "realistic opportunity to prevent an attack." Gaudreault, 923 F.2d at 207 n.3 (internal quotations and citation omitted).  See also Martinez v. Colon, 54 F.3d 980, 985 (1ˢᵗ Cir. 1995) (describing constitutional duty to intervene to protect against excessive force).  However, in the instant case, Nolan has not produced any evidence that Bates and/or Krajcik were in such a position outside the gymnasium so as to affect Fulcher's conduct, nor has he asserted facts to establish that they had a realistic opportunity to intervene.  Consequently, the motions of Bates and Krajcik for summary judgment as to Count I are allowed.

## 4.    **Qualified Immunity**

Krajcik and Fulcher argue that they are protected from liability for their allegedly unlawful actions by the doctrine of qualified immunity.  Qualified immunity shields government officials performing discretionary functions from liability for civil damages when "their conduct does not violate clearly established statutory or constitutional rights

of which a reasonable person would have known."[13]  Harlow v. Fitzgerald, 457 U.S. 800,

818, 102 S. Ct. 2727, 2738, 73 L. Ed. 2d 396 (1982).  "[W]hether an official protected by

qualified immunity may be held personally liable for an allegedly unlawful official action

generally turns on the 'objective legal reasonableness' of the action . . . assessed in light

of the legal rules that were 'clearly established' at the time it was taken."  Anderson v.

Creighton, 483 U.S. 635, 639, 107 S. Ct. 3034, 3038, 97 L. Ed. 2d 523 (1987) (quoting

Harlow, 457 U.S. at 818-19; 102 S. Ct. at 2738-39).  While qualified immunity cannot

protect the defendants from liability if, on an objective basis, no reasonably competent

officer would have acted as they did, "if officers of reasonable competence could disagree

on [the lawfulness of the alleged conduct], immunity should be recognized."  Malley v.

Briggs, 475 U.S. 335, 341, 106 S. Ct. 1092, 1096, 89 L. Ed. 2d 271 (1986).  Thus, the

defense of qualified immunity "provides ample protection to all but the plainly

incompetent or those who knowingly violate the law."  Id.

   The First Circuit, drawing on Supreme Court precedent, has developed a three-part

procedure for determining whether a state actor is entitled to qualified immunity.  The

procedure requires this court to consider

---

   [13]  The plaintiffs argue that Krajcik and Fulcher are not entitled to qualified immunity
because they were not acting within the scope of their discretionary authority at the time of the
allegedly unconstitutional conduct.  In particular, the plaintiffs contend that Massachusetts law
gives the town moderator and not the police full discretion to decide all questions of order of
speech and debate at a town meeting.  The evidence shows, however, that the defendant police
officers were present at the town meeting in order to maintain public order and security rather
than to determine how the meeting should be conducted or to decide questions regarding the
order of speech and debate.  Therefore, the court rejects the plaintiffs' assertion that Krajcik and
Fulcher were acting outside the scope of their discretionary authority.

> (i) whether the plaintiff[s'] allegations, if true, establish a consti-
> tutional violation; (ii) whether the constitutional right at issue was
> clearly established at the time of the putative violation; and (iii)
> whether a reasonable officer, situated similarly to the defendant[s],
> would have understood the challenged act or omission to contravene
> the discerned constitutional right.

Limone v. Condon, 372 F.3d 39, 44 (1st Cir. 2004).  "Under ordinary circumstances, the

development of the doctrine of qualified immunity is best served by approaching these

inquiries in the afore-stated sequence."  Cox v. Hainey, 391 F.3d 25, 30 (1st Cir. 2004).

For the reasons detailed above, the record establishes that the first prong has been

satisfied.  The facts, viewed in the light most favorable to the plaintiffs, could support a

finding that Krajcik and Fulcher deprived Nolan of his First Amendment rights by, inter

alia, seizing and removing him from a town meeting while he was engaged in

constitutionally protected speech, or his Fourth Amendment rights by seizing him without

probable cause.  Similarly, the defendants do not deny that the constitutional rights at

issue – the right of free speech (and the limited "fighting words" exception), the right to

remain free from arrest without probable cause, and the right to be free from the use of

excessive force – were all well established by the time of the incident.  Therefore, the

only factor in dispute is whether a similarly situated reasonable officer would have

known his conduct violated Nolan's constitutional rights.  This court concludes that while

the officers are entitled to qualified immunity for all the events which took place in the

gymnasium, because of the disputed facts as to what occurred out of the camera's view,

summary judgment should be denied on the claim against Fulcher for use of excessive force following Nolan's removal from the gym.

The court concludes that an objectively reasonable officer situated similarly to Krajcik and Fulcher could have reasonably believed that they were not violating Nolan's free speech rights and had probable cause to remove Nolan from the town meeting for disorderly conduct.  As stated above, the line which separates unconditionally guaranteed speech from speech which may be suppressed or punished "is finely drawn," Gooding, 405 U.S. at 522, 92 S. Ct. at 1106 (internal citations omitted), and distinguishing protected speech from unprotected "fighting words" requires consideration of the words in light of the circumstances in which they are uttered.  See Johnson, 491 U.S. at 409, 109 S. Ct. at 2542.  The undisputed facts, even when viewed in the light most favorable to Nolan, could cause reasonably competent police officers to conclude that Nolan's words and gestures constituted "fighting words."  Although Nolan's conduct did not in fact provoke a physical confrontation with any members of the audience, his challenge to the audience to "come on down and make me sit down," combined with his gesturing and calling the audience members "assholes," could reasonably have been perceived by an objective police officer as a "direct personal insult or an invitation to exchange fisticuffs." Id.  The fact that Krajcik did not expect Nolan's conduct to cause a fight or that Nolan's expression may in fact have been entitled to constitutional protection is not sufficient to defeat qualified immunity where the police officers' actions were objectively legally reasonable.  See Camilo-Robles v. Hoyos, 151 F.3d 1, 6 (1st Cir. 1998) ("state actors who

commit constitutional violations may be entitled to qualified immunity" where their conduct was objectively legally reasonable); Floyd v. Farrell, 765 F.2d 1, 4 (1st Cir. 1985) (the qualified immunity standard eliminates from consideration allegations about the official's subjective state of mind and concentrates only on the objective reasonableness of the official's conduct).  In light of the facts available to Krajcik and Fulcher at the time of the incident, they or any other officer in their shoes could reasonably have believed that Nolan was engaged in unprotected speech that did not preclude them from removing him from the town meeting.[14]

Similarly, Krajcik and Fulcher are protected by qualified immunity because an objectively reasonable police officer could have believed that there was probable cause to arrest Nolan for disorderly conduct pursuant to Mass. Gen. Laws ch. 272, § 53.  "[T]he reasonableness standards underlying the probable cause and qualified immunity inquiries are not coterminous."  Iacobucci v. Boulter, 193 F.3d 14, 23 (1st Cir. 1999).  Although both probable cause and qualified immunity analyses require the application of a reasonableness standard, qualified immunity requires a "somewhat lesser showing."  Cox, 391 F.3d at 31.  Thus, "if the presence of probable cause is arguable or subject to legitimate question, qualified immunity will attach."  Id.  Accordingly, even if Krajcik

---

[14]  The plaintiffs argue that no reasonable police officer witnessing Nolan's outburst and return to his seat would have determined that he had authority even to approach Nolan in an effort to calm him down.  However, nothing in the Constitution prohibits police officers from approaching individuals to speak with them or ask them questions.  See Mendenhall, 446 U.S. at 553, 100 S. Ct. at 1876.

and Fulcher had no probable cause to seize Nolan for disorderly conduct, "qualified immunity is pierced only if there *clearly* was no probable cause at the time the arrest was made."  Floyd, 765 F.2d at 5 (emphasis added).  See also Anderson, 483 U.S. at 641, 107 S. Ct. at 3039 (law enforcement officials should not be held liable where they reasonably but mistakenly conclude that probable cause is present).

Faced with the circumstances that Krajcik and Fulcher encountered at the town meeting on June 12, 2000, a reasonably objective police officer could have determined that Nolan's actions constituted "riotous commotion and excessively unreasonable noise" which created a public nuisance and supported probable cause to seize Nolan.  See A Juvenile, 368 Mass. at 597, 334 N.E.2d at 628 ("disorderly conduct" includes "tumul-tuous behavior," which is defined as "riotous commotion and excessively unreasonable noise so as to constitute a public nuisance" and "conduct which creates a condition of physical menace to others.").  Under these circumstances, probable cause was at least arguable.  See Sholley, 432 Mass. at 730, 739 N.E.2d at 243 ("Noisy behavior that attracts a crowd of onlookers is a common feature of cases involving 'tumultuous' conduct.").

Nolan, relying on Aponte Matos v. Toledo Davila, 135 F.3d 182 (1st Cir. 1998), argues that the defendants' failure to identify themselves as police officers defeats their defense of qualified immunity for Nolan's Fourth Amendment claims.  In that case, however, the First Circuit declined to rule on whether police officers, armed with a warrant, acted reasonably under the Fourth Amendment in failing to knock and identify

themselves before entering the dwelling to be searched.  See id. at 190.  Instead, the court

determined that the defendant police officers were shielded by qualified immunity

because no such constitutional right was clearly established until the Supreme Court

decided Wilson v. Arkansas, 514 U.S. 927, 115 S. Ct. 1914, 131 L. Ed. 2d 976 (1995).

Aponte Matos, 135 F.3d at 190-91.  Even in Wilson, however, the Supreme Court did not

find the obligation to identify oneself to be unequivocal.  Rather, the Court held only that

"in some circumstances an officer's unannounced entry into a home might be unreason-

able under the Fourth Amendment."  514 U.S. at 934, 115 S. Ct. at 1918.  The Court

further stated that "[t]he Fourth Amendment's flexible requirement of reasonableness

should not be read to mandate a rigid rule of announcement that ignores countervailing

law enforcement interests."  Id.  Therefore, it has not been clearly established that a

police officer's failure to identify himself before restraining an individual in a public

forum renders the seizure unreasonable under the Fourth Amendment.

Moreover, even if such a constitutional right had been established, a reasonable

officer in the defendants' position could have believed that he had sufficiently identified

himself to Nolan to support the reasonableness of Nolan's seizure.  Although Nolan says

he did not notice Krajcik's police badge, there is no dispute that Krajcik was wearing his

badge on his belt and had his jacket open.  The court concludes, therefore, that the

plaintiffs' allegations concerning Krajcik's failure to identify himself as a police officer

do not defeat Krajcik's and Fulcher's entitlement to qualified immunity with respect to

the plaintiffs' Fourth Amendment probable cause claims.

The final issue is whether the defendants are entitled to qualified immunity on Nolan's excessive force claim.  Although the standard for evaluating the use of excessive force, like the qualified immunity analysis, employs an objective reasonableness test, "[t]he inquiries for qualified immunity and excessive force remain distinct . . . ." Saucier v. Katz, 533 U.S. 194, 204, 121 S. Ct. 2151, 2158, 150 L. Ed. 2d 272 (2001).  Whereas the application of the objective reasonableness test to the merits of an excessive force claim requires careful attention to the facts and circumstances of the particular case and consideration of certain factors, as described in detail above, "[t]he concern of the immunity inquiry is to acknowledge that reasonable mistakes can be made as to the legal constraints on particular police conduct." Id. at 205, 121 S. Ct. at 2158.  Thus, qualified immunity operates "to protect officers from the sometimes hazy border between excessive and acceptable force" and "can apply in the event the mistaken belief was reasonable." Id. at 206, 121 S. Ct. at 2158-59 (quotations and citations omitted).

The question, therefore, is whether a reasonable officer in Fulcher's position could have believed that the force used following Nolan's removal from the town meeting was within the bounds of appropriate police responses.[15] See id. at 208, 121 S. Ct. at 2160.

---

[15] For the reasons detailed above, the claim of excessive force against Krajcik, Bates and Fulcher with respect to the events in the gymnasium, and Krajcik and Bates for outside as well, should be dismissed.  Consequently, there is no need to reach the issue of qualified immunity as to those events.  However, even if the plaintiff did state a claim for excessive force, it would be barred by qualified immunity since a reasonable police officer could have determined that the force used by Krajcik and Fulcher in the gymnasium, and Bates' and Krajcik's actions inside and outside the gymnasium, were reasonable under the circumstances.

The record is unclear as to exactly how much force Fulcher used outside the gymnasium.
The evidence does show that Nolan sustained some injury and that witnesses to the
incident attempted to intervene because they believed that Fulcher was trying to hurt
Nolan.  It remains unclear whether Nolan's behavior justified Fulcher's response and
could have supported a reasonable officer's belief that Fulcher's conduct was appropriate
or whether Fulcher's use of force was unmistakenly excessive.  Accordingly, further
resolution of the facts is necessary to determine whether qualified immunity applies to
protect Fulcher from the excessive force claim.

In sum, the motions for summary judgment of Krajcik and Bates shall be allowed
in their entirety as to Count I.  Fulcher's motion shall be allowed as to events in the
gymnasium but denied as to events outside.

### D.   Count II  vs.  Krajcik and Bates
### Punitive Damages

In Count II of his Complaint, Nolan is seeking punitive damages against Krajcik
and Bates pursuant to 42 U.S.C. § 1983.  Since there is no liability on the part of these
defendants under § 1983, their motions for summary judgment as to Count II will be
allowed as well.

Even if there were claims against Krajcik and Bates which survived the motions
for summary judgment as to Count I, Nolan would not be entitled to punitive damages.
"Punitive damages become a discretionary matter for the jury in a section 1983 action
only if the plaintiff makes an adequate threshold showing.  A plaintiff reaches that

threshold when 'the defendant's conduct is shown to be motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others.'" Iacobucci v. Boulter, 193 F3d at 25-26 (quoting Smith v. Wade, 461 U.S. 30, 56, 103 S. Ct. 1625, 75 L. Ed. 2d 632 (1983)).  Here, the record shows that Krajcik acted appropriately within the gymnasium and there are no facts asserted that Bates affirmatively violated Nolan's constitutional rights in the gymnasium.  The record is devoid of any evidence that these defendants' failure to supervise Fulcher outside was a result of "malice" or was "with reckless indifference to [Nolan's] constitutional rights." Id. at 26.  This is even more apparent given that the plaintiff has not sought punitive damages from Fulcher himself.  Consequently, summary judgment will enter on Count II of the Complaint in favor of Krajcik and Bates.

### E.     Count III  vs.  Paicos, Bates, Easton 42 U.S.C. § 1983

In Count III, Nolan asserts a claim under 42 U.S.C. § 1983 against Paicos and Bates arising out of allegedly defamatory remarks they made following the incident.  In Count III, Nolan also contends that the Town of Easton is liable under 42 U.S.C. § 1983 for failure to supervise and train its employees.  For the reasons detailed herein, summary judgment shall be entered in favor of the defendants on this Count as well as on Count IV, in which Nolan is seeking punitive damages against Paicos and Bates arising out of the same challenged conduct.

1.    **Defamation**

It is Nolan's contention that the statements made by Paicos and Bates both

deprived him of a fundamental liberty interest and so stigmatized, threatened and

ridiculed Nolan that he was effectively prevented from exercising his constitutional rights

of free speech and political participation.[16]   However, "[t]he Supreme Court has

determined authoritatively that defamation, even from the lips of a government actor,

does not in and of itself transgress constitutionally assured rights." Pendleton v. City of

Haverhill, 156 F.3d 57, 62-63 (1st Cir. 1998) (citing Paul v. Davis, 424 U.S. 693, 700-01,

96 S. Ct. 1155, 1160, 47 L. Ed. 2d 405 (1976)) (an interest in reputation is not a "liberty"

or "property" interest protected against state deprivation without due process of law under

the Fourteenth Amendment).   Consequently, Nolan's claim that the defendants'

defamatory comments deprived him of a constitutionally protected liberty interest must

fail.

An exception to this conclusion can be found in "stigma plus" cases, where courts

have recognized "a deprivation of a constitutionally protected liberty interest when, in

addition to mere reputational injury, words spoken by a government actor adversely

---

[16]  In their brief in opposition to Paicos' motion for summary judgment, the plaintiffs argue
that Paicos could also be held liable as a conspirator for any unlawful actions that Krajcik and
Fulcher [or Bates] committed in connection with their removal of Nolan from the Easton town
meeting.  However, the plaintiff has not alleged that Paicos deprived Nolan of any of the
constitutional rights alleged in Count I, nor has he alleged elsewhere in the complaint that Paicos
participated in a conspiracy to deprive Nolan of his constitutional rights.  The record simply does
not support a conspiracy claim and it will not be considered further.

impact a right or status previously enjoyed under state law." <u>Pendleton</u>, 156 F.3d at 63,

and cases cited.  <u>See also</u> <u>Aponte v. Calderon</u>, 284 F.3d 184, 196 (1st Cir. 2002) ("we

have consistently held that 'the injury to reputation must be accompanied by a change in

the injured person's status or rights (under substantive state or federal law).'") (quoting

<u>Beitzell v. Jeffrey</u>, 643 F.2d 870, 878 (1st Cir. 1981)), <u>cert.</u> <u>denied</u>, 537 U.S. 886, 123

S. Ct. 128, 154 L. Ed.2d 145 (2002).  The First Circuit has emphasized, however, that "a

violation of constitutional proportions under a 'stigma plus' theory exists only if, and to

the extent that, the opportunities lost are government benefices denied as a result of

governmental action."  <u>Pendleton</u>, 156 F.3d at 63.

   Nolan has attempted to support a due process claim against Paicos and Bates by

demonstrating that his case falls within "the narrow category of situations that involve

more than simple stigmatization."  <u>Id.</u>  Specifically, Nolan argues that the defendants'

statements were so damaging and intimidating that he stopped attending town meetings

and was effectively deprived of his First Amendment rights.  However, although Nolan

claims that he felt too intimidated to attend town meetings, he has presented no facts

showing that he actually was prohibited from attending or speaking at town meetings or

that he was, in fact, deprived of any rights whatsoever.  Where, as here, "there is no

indication that [the plaintiff has] lost any legal rights because of the alleged defamation

by government actors," the plaintiff has not asserted a constitutionally protected interest

in his reputation.  Aponte, 284 F.3d at 196.  Consequently, Paicos' and Bates' motions

for summary judgment on Counts III and IV are allowed.[17]

### 2.   Municipal Liability

In Count III of the Complaint, Nolan contends that the Town deprived him of a

right to procedural due process because it provided no procedures through which Nolan

could restore his allegedly defamed reputation and his ability to participate freely in town

government without fear of retaliation.  However, in their Memorandum of Law in

Opposition to Defendant Easton's Motion for Summary Judgment (Docket No. 50 at 3),

the plaintiffs state that they are withdrawing their procedural due process claims against

Easton, and further concede that there were adequate procedures in place by which Nolan

could have sought redress.  Because the plaintiffs agree that the Town did not deprive

Nolan of a constitutional right to procedural due process, this court grants Easton's

motion for summary judgment on that claim.

The plaintiffs also allege in Count III that the Town violated Nolan's due process

and equal protection rights by inadequately training, supervising and restraining its police

officers and by maintaining a policy of allowing police officers and the town

administrator to remove citizens from town meetings based upon the content of their

speech and without direction from the moderator.  Easton counters that it is entitled to

---

[17]  The plaintiffs argue that as a result of Paicos' public statements, the Town of Easton
failed to conduct a hearing to address complaints that Nolan had been wrongfully ejected from the
town meeting.  Because there is no evidence that Paicos' comments actually thwarted any such
hearing, the court declines to further address this issue.

summary judgment because there is no evidence that the Town maintained any such policy or custom or that it had an inadequate police officer training program which reflected the Town's deliberate indifference to the constitutional rights of its inhabitants. As described in more detail below, the record is void of any evidence supporting municipal liability.  The Town, therefore, is entitled to summary judgment on the remaining claims set forth in Count III.

"To make out a case for municipal liability under 42 U.S.C. § 1983, the Supreme Court has repeatedly held that liability can be found only 'where the municipality *itself* causes the constitutional violation at issue.  *Respondeat superior* or vicarious liability will not attach under § 1983.'" <u>Santiago v. Fenton</u>, 891 F.2d 373, 381 (1ˢᵗ Cir. 1989) (quoting <u>Canton v. Harris</u>, 489 U.S. 378, 385, 109 S. Ct. 1197, 1203, 103 L. Ed. 2d 412 (1989)). Accordingly, the court has required "a plaintiff seeking to impose liability on a municipality under § 1983 to identify a municipal 'policy' or 'custom' that caused the plaintiff's injury." <u>Bd. of the County Comm'rs v. Brown</u>, 520 U.S. 397, 403, 117 S. Ct. 1382, 1388, 137 L. Ed. 2d 626 (1997).  Thus, in order to establish municipal liability against Easton, the plaintiff must "demonstrate both the existence of a policy or custom and a causal link between that policy and the constitutional harm." <u>Santiago</u>, 891 F.2d at 381.

The record contains no evidence that Easton had a policy or custom allowing police officers to regulate or otherwise infringe upon the free speech or other constitutional rights of its citizens.  In fact, the record indicates that the Easton Police Department had policies in place that were intended to allow police officers to maintain order without

depriving individuals of their First Amendment rights.  For example, the Department's

guidelines and procedures for arrests specifically state that "[v]erbal abuse alone is not a

sufficient justification for an arrest."  (EF ¶ 18).  In addition, Department training

materials define "disorderly conduct" consistent with the SJC opinions that have

construed that term so as not to include activities or speech involving the lawful exercise

of a First Amendment right.  (See Krajcik Ex. H).  The fact that a municipal employee

may have applied a Town policy or guideline in an unconstitutional manner is insufficient

to impose liability upon the Town itself.  See Brown, 520 U.S. at 406-07, 117 S. Ct. at

1389 ("That a plaintiff has suffered a deprivation of federal rights at the hands of a

municipal employee will not alone permit an inference of municipal culpability and

causation; the plaintiff will simply have shown that the *employee* acted culpably.");

Canton, 489 U.S. at 387, 109 S. Ct. at 1204 (without more, city is not automatically liable

under § 1983 when one of its employees happens to apply a policy in an unconstitutional

manner).  Therefore, even if Nolan is able to prove that one or more defendants deprived

him of his constitutional rights, the plaintiffs have not presented any evidence that a

municipal policy or custom caused that harm.

Similarly, the plaintiffs have presented no facts supporting their claim that Easton

failed to train its police officers.  "[T]he inadequacy of police training may serve as the

basis for § 1983 liability only where the failure to train amounts to deliberate indifference

to the rights of persons with whom the police come into contact."  Canton, 489 U.S. at

388, 109 S. Ct. at 1204.  Only where the municipality's failure to train its employees

reflects a "deliberate indifference" to its citizens' constitutional rights "can such a shortcoming be properly thought of as a city 'policy or custom' that is actionable under § 1983." Id. at 389, 109 S. Ct. at 1205.  In order to establish municipal liability based on an alleged failure to train, there must be an identified deficiency in the Town's training program that is closely related to the alleged constitutional deprivation.  Id. at 391, 109 S. Ct. at 1206.  Here, the plaintiffs have identified no particular deficiency in Easton's police training program.  Consequently, Easton is entitled to summary judgment on Count III of the Complaint.

> **F.     Count V  vs.  Krajcik and Fulcher**
> **Assault and Battery**

In Count V of the Complaint, Nolan alleges claims for assault and battery against Krajcik and Fulcher.  The defendants have moved for summary judgment on this Count on the grounds that they did not use excessive force and therefore cannot be held liable for assault and battery under Massachusetts law.

"[A]ssault and battery is the intentional and unjustified use of force upon the person of another, however slight, or the intentional doing of a wanton or grossly negligent act causing personal injury to another."  Commonwealth v. McCan, 277 Mass. 199, 203, 178 N.E. 633, 634 (1931).  A police officer "attempting a valid arrest has the right to use the force which is reasonably necessary to overcome physical resistance by the person sought to be arrested . . . ."  Julian v. Randazzo, 380 Mass. 391, 396, 403 N.E.2d 931, 934 (1980).  "The standard for determining whether force is reasonable for

assault and battery claims is 'essentially the same' as the standard for determining if force is reasonable for Fourth Amendment excessive force claims."  <u>Parker v. Town of Swansea</u>, 270 F. Supp. 2d 92, 102 (D. Mass. 2003).  "Thus, in other words, the plaintiff's assault and battery claims will rise or fall in the same manner as his Fourth Amendment claims . . . ."  <u>Jesionowski v. Beck</u>, 937 F. Supp. 95, 105 (D. Mass. 1996).

As set forth above, Fulcher is not entitled to summary judgment on Nolan's excessive force claim as it relates to his behavior outside the gymnasium because a disputed issue remains as to whether Fulcher used an objectively reasonable amount of force or employed force that was excessive under the circumstances.  As a result, Fulcher's motion for summary judgment on the assault and battery claim is denied as to that conduct only.

On the other hand, as detailed above, Krajcik did not use excessive force inside the gymnasium, and there is no evidence that he wrongfully failed to intervene outside. Therefore, Krajcik's motion for summary judgment as to Count V is allowed.

### G.    Count VI  vs.  Paicos and Bates Defamation

In Count VI of the Complaint, Nolan asserts a common law defamation claim against Paicos and Bates.  The defendants argue that they are entitled to summary judgment because their statements were not defamatory and because Paicos' statements reflected only his opinion.  They further argue that the plaintiff has presented no evidence to support his allegation that Bates and Paicos were responsible for the publication of a

report in the <u>Brockton Enterprise</u> police blotter regarding the removal of a disorderly

resident from the town meeting.  This court finds that the defendants have not defamed

Nolan and that Paicos and Bates are entitled to summary judgment on Count VI.

"Defamation is the publication of material by one without a privilege to do so

which ridicules or treats the plaintiff with contempt."  <u>Correllas v. Viveiros</u>, 410 Mass.

314, 319, 572 N.E.2d 7, 10 (1991).  In order to prove defamation, the plaintiff must show

"(1) a false and defamatory communication (2) of and concerning the plaintiff which is

(3) published or shown to a third party."  <u>Dorn v. Astra USA</u>, 975 F. Supp. 388, 396 (D.

Mass. 1997).  Accordingly, "a threshold issue is whether the statement is reasonably

susceptible of a defamatory meaning, and that determination is a question of law for the

court."  <u>Foley v. Lowell Sun Publ'g Co.</u>, 404 Mass. 9, 11, 533 N.E.2d 196, 197 (1989).

If the communication "is susceptible of both a defamatory and nondefamatory meaning, a

question of fact exists for the jury."  <u>Jones v. Taibbi</u>, 400 Mass. 786, 792, 512 N.E.2d

260, 264 (1987).  However, summary judgment for the defendants is appropriate if the

words at issue are incapable of a defamatory meaning.  <u>See</u> <u>Smith v. Suburban Rest., Inc.</u>,

374 Mass. 528, 529, 373 N.E.2d 215, 217 (1978).

A statement cannot be defamatory if it is substantially true.  <u>See</u> <u>Jones</u> at 794, 512

N.E.2d at 266 (truth is a defense to defamation); <u>Reilly v. Associated Press</u>, 59 Mass.

App. Ct. 764, 770, 797 N.E.2d 1204, 1211 (2003) ("when a statement is substantially

true, a minor inaccuracy will not support a defamation claim").  Bates argues, and the

undisputed facts confirm, that his statement that "this wasn't the first time Mr. Nolan had

to be escorted out of a town meeting" is true.  The evidence shows that in 1991, a

constable in uniform escorted Nolan from a town meeting for speaking out of order.

Even if, as Nolan argues, the circumstances surrounding the 1991 incident differed from

the circumstances surrounding his removal from the June 2000 meeting, nothing about

Bates' statement was untrue.  Accordingly, Bates' comments regarding Nolan's removal

from the town meeting do not support Nolan's defamation claim.

Similarly, the statements attributed to Paicos do not rise to the level of defamation.

In order to determine whether Paicos' statements can reasonably be interpreted as

defamatory, the court must examine the statements in their totality and in the context in

which they were published.  See Foley, 404 Mass. at 11, 533 N.E.2d at 197.  Paicos'

comments are set forth in a newspaper article entitled "Police defended by town

administrator."  (Paicos Ex. D).  The article describes how a citizen asked the Easton

Board of Selectmen to conduct an independent investigation into Nolan's treatment after

he was whisked out of the hall following an argument with other voters.  (Id.).  It states

that Paicos responded by stating, "[a]ny representation that any Easton police officer

acted wrongly here is nothing more than an outrageous rumor."  (Id.)  The article then

reports that the citizen who requested the investigation told the Board that it should look

into the matter "before it goes to a civil suit."  (Id.).  Paicos, according to the article, said

he had received a full report of the incident from Bates and had viewed video footage of

the event.  (Id.).  Paicos was further quoted as saying that the police officers acted "with

remarkable restraint and discretion.  I've sent the police a letter of commendation. They

acted very professionally.  No complaints or charges have been raised by anyone in town, and the town didn't charge the resident in question with anything . . . [i]t's outrageous that anyone would spread such rumors."  (Id.).  Additionally, the article reports that Nolan had been upset by a request "for a nonbinding resolution supporting Paicos, whose contract had not been renewed by selectmen," and that the Board did not act on the request for an investigation because, according to the Board, "there was no evidence substantiating that an incident took place and no claim [was] made."  (Id.).  Finally, it states that a Brockton Enterprise correspondent had witnessed the police escorting Nolan out of the town meeting and had seen "no questionable treatment."  (Id.).

After examining Paicos' statements in the context of the entire article, the court determines that a reasonable reader could not conclude that Paicos was accusing Nolan of criminal behavior or of acting in a manner that "would tend to hold the plaintiff up to scorn, hatred, ridicule or contempt, in the minds of any considerable and respectable segment in the community," and would therefore be considered defamatory.  See Phelan v. May Dep't Stores Co., 443 Mass. 52, 56, 819 N.E.2d 550, 553 (2004) (quotations and citation omitted).  Rather, when read in context, Paicos' statements reflect, at most, an effort to deflect criticism of the police; they are not aimed at disparaging Nolan.  Indeed, Paicos' statement that the town didn't charge the resident in question with anything

suggests that Nolan did nothing criminal.  Accordingly, the court finds that Paicos'

statements are not susceptible of defamatory meaning.[18]

Finally, Paicos and Bates contend that Nolan has failed to support his defamation

claim against them because he has not presented any evidence that Paicos and Bates were

responsible for the publication of a report in the <u>Brockton Enterprise</u> police blotter

regarding Nolan's removal from the town meeting.  The report states only that "[a]t 10:45

p.m., a disorderly resident was removed from town meeting by Deputy Police Chief

Krajcik and detectives."  (BF ¶¶ 26-27).  Nothing in the record indicates that Paicos or

Bates issued the statement or was otherwise responsible for its publication.  In order to

prevail on a defamation claim, the plaintiff must "establish that the defendants published

a false statement about him to a third party."  <u>Id.</u> at 55-56, 819 N.E.2d at 553.  Because

the plaintiff has failed to present evidence to create a disputed issue of fact regarding the

defendants' responsibility for the statement in the press, the defendants' motion must be

allowed.  Accordingly, the court grants Paicos' and Bates' motions for summary

judgment with respect to Nolan's defamation claim.

### H.    Count VII  vs.  Krajcik, Fulcher, Bates and Paicos<br>Mass. Gen. Laws ch. 12, § 11

In Count VII of the Complaint, Nolan has asserted civil rights claims against

defendants Krajcik, Fulcher, Bates and Paicos pursuant to the MCRA, Mass. Gen. Laws

---

[18]  In light of this conclusion, the court will not address Paicos' alternative arguments that the statements did not concern Nolan and that they constituted protected opinion.

ch. 12, § 11.[19]  The defendants argue that they are entitled to summary judgment on these claims because they did not violate the plaintiff's constitutional rights.  Krajcik and Fulcher also assert that they are shielded from liability under the MCRA by the doctrine of qualified immunity.

To prevail under the MCRA, the plaintiff "must prove that (1) his exercise or enjoyment of rights secured by the Constitution or laws of either the United States or of the Commonwealth (2) has been interfered with, or attempted to be interfered with, and (3) that the interference or attempted interference was by 'threats, intimidation or coercion.'"  Bally v. Northeastern Univ., 403 Mass. 713, 717, 532 N.E.2d 49, 51-52 (1989) (quoting Mass. Gen. Laws ch. 12, § 11H).  "The MCRA is coextensive with 42 U.S.C. § 1983, except that the Federal statute requires State action whereas its State counterpart does not, and the derogation of secured rights must occur by threats, intimidation or coercion."  Sietins v. Joseph, 238 F. Supp. 2d 366, 377-78 (D. Mass. 2003) (internal quotations and citations omitted).  Moreover, "[t]he same qualified immunity standard that applies under § 1983 has also been held to apply to claims under the MCRA."  Kelley v. LaForce, 288 F.3d 1, 10 (1st Cir. 2002).  See also Duarte v. Healy,

---

[19]  Mass. Gen. Laws ch. 12, § 11H states in relevant part: "Whenever any person or persons, whether or not acting under color of law, interfere by threats, intimidation or coercion, or attempt to interfere by threats, intimidation or coercion, with the exercise or enjoyment by any other person or persons of rights secured by the constitution or laws of the United States, or of rights secured by the constitution or laws of the commonwealth, the attorney general may bring a civil action for injunctive or other appropriate equitable relief in order to protect the peaceable exercise or enjoyment of the right or rights secured."  Mass. Gen. Laws ch. 12, § 11I authorizes civil actions by any person who has suffered the interference or attempted interference of the rights described in § 11H.

405 Mass. 43, 46, 537 N.E.2d 1230, 1232 (1989).  Consequently, "a state official cannot

be held liable under the MCRA for discretionary official actions that violate (federal or

state) constitutional or statutory rights unless those rights were clearly established at the

time of the violation and the official's actions were objectively unreasonable."  Kelley,

288 F.3d at 10.

For the reasons detailed above, Nolan cannot maintain his claims of constitutional

violations against Paicos,[20] Krajcik,[21] and Bates.  Consequently, their motions for

summary judgment on this Count of the Complaint are allowed as well.  With respect to

Fulcher, for the reasons detailed above, only the claim asserting the use of excessive

force outside the gymnasium survives the motion for summary judgment.

## I.     Count VIII  vs.  Town of Easton
##        Massachusetts Tort Claims Act

In Count VIII of the Complaint, Nolan alleges a claim against the Town of Easton

pursuant to the Massachusetts Tort Claims Act, Mass. Gen. Laws ch. 258 ("MTCA" or

the "Act").  As set forth in the Complaint, Nolan alleges that Easton, by its agents and

---

[20]  While Nolan argues that the Massachusetts constitution provides him more protection against defamation than the U.S. Constitution, that issue does not have to be reached as the statements by Paicos were not defamatory.

[21]  Nolan argues that under Massachusetts law, he is entitled to greater protection against an arrest for a misdemeanor than provided for by the Fourth Amendment because the misdemeanor must be continuing at the time of the arrest for a misdemeanor.  See Richardson v. City of Boston, 53 Mass. App. Ct. 201, 203, 758 N.E.2d 629, 631 (2001).  Regardless of the legal merits of this claim, it is not factually supportable.  There was no "break in the action" so to speak.  Nolan continued to shout at the audience while sitting down, Krajcik came over to him immediately after he sat down, and Nolan promptly jumped up and started pushing Krajcik.  The conduct was "continuing" at the time Krajcik approached him.

servants, negligently breached a duty of care owed to the plaintiff by: (1) inadequately training, supervising and restraining the defendant police officers, (2) providing the defendant police officers with unlawful and practically unlimited discretion to respond to the content of a citizen's political speech and conduct at a town meeting, (3) providing Paicos with unrestrained apparent authority to speak on behalf of the Town with respect to political matters, including the conduct of town meetings, and to denigrate a citizen in the news media, and (4) other negligent acts and omissions of its agents and servants. The Town has moved for summary judgment on the grounds that its is entitled to immunity under § 10(b) of the Act.  It also argues that the facts do not support Nolan's allegations.

As discussed previously, the plaintiffs have presented no facts to support their allegations of inadequate training.[22]  Moreover, the plaintiffs have presented no facts to support their allegation that the Town provided its police officers with unlimited discretion to respond to or otherwise infringe upon citizens' speech, or their allegations regarding Paicos' unbridled authority to speak on the Town's behalf.  Therefore, the plaintiffs cannot support their negligence claims against the Town of Easton under the Act on the basis of these allegations.

---

[22]  Because the plaintiffs have not presented any evidence to create a disputed issue of material fact that would require trial regarding Easton's failure to adequately train and supervise its police officers, the court finds it unnecessary to address Easton's argument that it is entitled to immunity from liability under the Act for claims based on its alleged failure to train and supervise.

The plaintiffs argue further that Krajcik and Bates negligently breached a duty of care that they owed to the Town's inhabitants by failing to meet and confer among themselves and with the meeting moderator in preparation for the June 12, 2000 town meeting, and that this breach proximately caused Nolan's injuries.  <u>See</u> Plaintiffs' Memorandum of Law in Opposition to Defendant Easton's Motion for Summary Judgment (Docket No. 50) at p. 13.  Thus, they claim that the Town is liable under a theory of *respondeat superior*.  Because the Town has immunity under § 10(b) of the Act since the defendant police officers were performing discretionary functions and were acting within the scope of their employment, the Town is entitled to summary judgment on this claim as well.

The Act provides in pertinent part:

> Public employers shall be liable for injury or loss of property or personal injury or death caused by the negligent or wrongful act or omission of any public employee while acting within the scope of his office or employment, in the same manner and to the same extent as a private individual under like circumstances ....

Mass. Gen. Laws ch. 258, § 2.  The Act contains a number of exceptions that shield public employers from liability.  One of those exceptions, contained in § 10(b), provides immunity to public employers for "any claim based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a public employer or public employee, acting within the scope of his office or employment, whether or not the discretion involved is abused[.]"  Mass. Gen. Laws ch. 258, § 10(b).

The SJC has established a two-part test to determine whether a plaintiff's claim for negligent conduct against a local government is barred by § 10(b).  See Serrell v. Franklin County, 47 Mass. App. Ct. 400, 402, 713 N.E.2d 389, 391 (1999).  "The first step in deciding whether the discretionary function exception forecloses a plaintiff's claim 'is to determine whether the governmental actor had any discretion . . . to do or not to do what the plaintiff claims caused [the] harm.'"  Greenwood v. Town of Easton, 444 Mass. 467, 469, 828 N.E.2d 945, 948 (2005) (quoting Harry Stoller & Co. v. Lowell, 412 Mass. 139, 141, 587 N.E.2d 780 (1992)).  "[I]f the governmental actor had no discretion because a course of action was prescribed by a statute, regulation, or established agency practice, [the] discretionary function exception to governmental liability has no role to play in deciding the case."  Id. (quotations and citation omitted).  Here, the plaintiffs have not challenged the Town's assertion that the police officers were exercising some amount of discretion.

The second part of the test requires a determination as to whether "the discretion exercised rises to the level of policy-making or planning, as that is the only type of discretion immunized by § 10(b)."  Alake v. City of Boston, 40 Mass. App. Ct. 610, 612, 666 N.E.2d 1022, 1024 (1996), review denied, 423 Mass. 1105, 670 N.E.2d 966 (1996).  Accordingly, decisions "resting on the exercise of judgment and discretion geared toward planning and policymaking" are immunized under § 10(b), Serrell, 47 Mass. App. Ct. at 402, 713 N.E.2d at 391, but "[d]ecisions that require discretion, but that do not involve social, political, or economic policy considerations are not immunized by § 10(b).

-55-

Likewise, governmental actions that involve merely the implementation and execution of governmental policy or planning are not immunized under the [A]ct." Alake, 40 Mass. App. Ct. at 614, 666 N.E.2d at 1025. Accord Greenwood, 444 Mass. at 470, 828 N.E.2d at 949.

In the instant case, Nolan is challenging the decisions made in connection with preparing for security at the meeting. This is clearly a challenge to "planning and policymaking" for which there is immunity. See Alake, 40 Mass. App. Ct. at 612-13, 666 N.E.2d at 1024 ("decisions about allocating limited resources to provide adequate security qualify as policy decisions within the meaning of § 10(b), and are exempt from suit under the [A]ct."), and cases cited. Accordingly, the Town is immune from any liability arising out of the police officers' alleged negligence in failing to make appropriate security decisions, and its motion for summary judgment on Count VIII is allowed.

### J.      Count IX  vs.  All Defendants
   Loss of Consortium

Finally, in Count IX of the Complaint, plaintiff Marie Nolan has asserted a loss of consortium claim against all five defendants. The defendants contend, and the plaintiffs do not contest, that they are entitled to summary judgment on this claim if they are entitled to summary judgment on the plaintiffs' tort claims.

"As a general rule, a claim for loss of consortium requires proof of a tortious act that caused the claimant's spouse personal injury." Sena v. Commonwealth, 417 Mass.

250, 264, 629 N.E.2d 986, 994 (1994).  Although a claim for loss of consortium is independent of the spouse's claims, there is an "implicit prerequisite that the injured spouse have a viable claim."  Id.  However, the claim must be one for personal injury; "[t]he spouse of an alleged federal civil rights victim is not permitted an ancillary cause of action for loss of consortium."  Id. (internal quotations and citation omitted).

As detailed above, the sole claims surviving the motions for summary judgment relate to those raising claims of use by Fulcher of excessive force outside the gymnasium. Consequently, the motions of Krajcik, Bates, Paicos and the Town for summary judgment as to Count IX are allowed.  Fulcher's motion is denied.

## IV.  CONCLUSION

For all the reasons detailed herein, the motions of Krajcik, Bates, Paicos and the Town for summary judgment (Docket Nos. 25, 27, 29 and 31) are ALLOWED.

The motion of Fulcher for summary judgment (Docket No. 33) is DENIED as to the claims in Counts I, V, VII and IX relating to his alleged use of excessive force outside the gymnasium, and otherwise ALLOWED.

> / s / Judith Gail Dein
> Judith Gail Dein
> United States Magistrate Judge